C. Joseph SALAZAR, II, Appellant,

v.

James A. COLLINS and Jack M. Garner, Appellees.

No. 10–06–00377–CV.

Court of Appeals of Texas, Waco.

Feb. 27, 2008.

Rehearing Overruled March 18, 2008.

C. Joseph Salazar II, Rosharon, pro se.

Christopher C. Wike, Asst. Atty. Gen., Austin, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Prison inmate C. Joseph Salazar, II appeals from a summary judgment granted in favor of prison administrators James A. Collins and Jack M. Garner. Salazar contends in three issues that: (1) the court erred by granting Collins's and Garner's summary-judgment motion and denying Salazar's motion for partial summary judgment because the evidence conclusively establishes that they had a legal duty to protect him from another inmate who assaulted him (two issues); and (2) the court abused its discretion by permitting the withdrawal of deemed admissions. We will reverse and remand.

### Background

Salazar's suit is based on an allegation that he was attacked with a weapon by fellow inmate Mark Basden in December 1992,[1] "which resulted in a prominent scar and permanent disfigurement." At the time of the alleged assault, Collins was the Executive Director of the Texas Department of Criminal Justice, and Garner was the warden of the Hughes Unit where Salazar was imprisoned. Salazar alleged in his Sixth Amended Complaint[2] that Collins and Garner (collectively, "Appellees") were liable for various theories of negligence and gross negligence because TDCJ "agents, employees, and servants" housed Salazar in the administrative segregation unit with Basden even though they knew that both were associated with competing "disruptive groups" and because of the manner in which TDCJ "agents, employees, and servants" implemented or failed to implement administrative policies promulgated by TDCJ for security in administrative segregation units.

Salazar filed a motion for partial summary judgment in which he alleged that Appellees owed him a duty as a matter of law to control Basden's conduct and that section 501.019 of the Government Code does not apply.[3] Salazar argued in particular that they owed him a duty to control Basden's conduct because a "special relationship" existed between Appellees and Basden and because they "had specific control over the security of the premises."

Appellees filed a traditional summary-judgment motion[4] in which they argued

1. Salazar's lawsuit has been pending since 1994, and there have been four prior proceedings in this Court related to his suit.

2. This was Salazar's live pleading on file when Appellees filed their summary-judgment motion.

3. Section 501.019 permits the State to deduct the cost of incarceration as a setoff against any adverse judgment rendered in an inmate's favor. See TEX. GOV'T CODE ANN. § 501.019 (Vernon 2004).

4. Although Appellees' motion refers to both subsections (c) and (i) of Rule of Civil Procedure 166a, which govern traditional and no-evidence summary-judgment motions respectively, their motion does not delineate in any manner between traditional and no-evidence claims. See TEX.R. CIV. P. 166a(c), (i). Salazar cites the standard of review applicable to traditional summary-judgment motions in his brief, and Collins and Garner do not dispute that this is the applicable standard. Therefore, we construe their motion as one for a

that: (1) they owed no legal duty to Salazar because his injuries were not foreseeable, the imposition of such a duty in the prison context would be contrary to public policy, and there was no "special relationship" between Basden and them merely because of their status as prison administrators; and (2) they have official immunity because inmate housing assignments are discretionary matters, they were acting in their official capacity, and Salazar did not allege that they acted in bad faith.

In Salazar's First Amended Motion for Partial Summary Judgment and Responses to Defendants Motion for Summary Judgment, he abandoned his claim regarding section 501.019 of the Government Code but reiterated his duty contention on the same grounds. In response to Appellees' summary-judgment claims, he argued that:

(1) they owed him a duty of reasonable care because of their "special relationship" with him;

(2) they are not entitled to official immunity because:

(A) prison guards admittedly failed to follow TDCJ policy AD–03.50 (governing prisoners in administrative segregation) which requires among other things that guards thoroughly search dayrooms and recreational areas "prior to and after each use" and thoroughly strip-search inmates "before and after recreation or leaving the assigned cellblock," and

(B) policy AD–03.50 imposes ministerial rather than discretionary duties; and

(3) they are not entitled to official immunity because the allegations of his petition that they acted with "gross neg-

ligence," "reckless disregard," and "conscious indifference" should be construed as allegations of bad faith.

In support of his amended motion/response, Salazar offered his own affidavit, Appellees' responses to his first and fourth requests for admissions, his second request for admissions and production of documents, which Appellees had failed to answer, and his third request for admissions, which Appellees had also failed to answer.

Appellees filed a response in which they argued primarily that they had no legal duty because they had no "day-to-day control and supervision" over Basden. However, they did not provide additional summary-judgment evidence to support this contention.

During a telephonic hearing on the summary-judgment motions, the court asked Salazar to provide copies of the signed return receipts accompanying his unanswered discovery requests, which Salazar did by filing a "Supplemental Record" about one week after the hearing. These receipts demonstrate that the Attorney General's office received Salazar's discovery requests as he alleged.

Appellees then filed a motion to strike their deemed admissions. They admitted that the discovery requests were received by the Attorney General's office but argued that their failure to answer was accidental and not the result of conscious indifference because the documents were never received by the attorney-in-charge of their case. They also argued that Salazar would not be prejudiced if their deemed admissions were withdrawn.

traditional summary judgment. *See Waite v. Woodard, Hall & Primm, P.C.,* 137 S.W.3d 277, 281 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *Amouri v. Sw. Toyota, Inc.,* 20 S.W.3d 165, 168 (Tex.App.-Texarkana 2000, pet. denied); *see also Binur v. Jacobo,* 135 S.W.3d 646, 650–51 (Tex.2004).

In a subsequent hearing, the court granted Appellees' motion to strike the deemed admissions, denied Salazar's amended motion for partial summary judgment, took Appellees' summary-judgment motion under advisement, and set the case for jury trial.

Salazar then filed his Eighth Amended Complaint, alleging only two claims against Appellees, namely, that they are liable for ordinary negligence and gross negligence because their "agents, employees and/or servants failed to take reasonable steps to control the conduct of Basden" (the inmate who assaulted Salazar). In connection with these claims, Salazar alleges that prison employees at the Hughes Unit failed to follow TDCJ policy AD–03.50, complaining in particular that prison guards failed to thoroughly search dayrooms and recreational areas "prior to and after each use" or thoroughly strip-search inmates "before and after recreation or leaving the assigned cellblock."[5]

The trial court granted Appellees' summary-judgment motion, holding in particular that neither Appellee "owed a legal duty to Plaintiff Salazar" and that both Appellees "are entitled to official immunity."

### Deemed Admissions

Salazar contends in his third issue that the court abused its discretion by permitting Appellees to withdraw their deemed admissions.

■ A trial court has broad discretion to grant or deny a request to withdraw deemed admissions. *Wheeler v. Green,* 157 S.W.3d 439, 443 (Tex.2005) (per curiam). No abuse of discretion occurs in this regard if there is a showing of (1)

good cause and (2) no undue prejudice. *Id.* at 442 (citing Tex.R. Civ. P. 166a(c), 198.3). Good cause is established by a showing that the failure to respond to the request for admissions "was an accident or mistake, not intentional or the result of conscious indifference." *Id.* "Even a slight excuse will suffice, especially when delay or prejudice to the opposing party will not result." *Boulet v. State,* 189 S.W.3d 833, 836 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (quoting *Spiecker v. Petroff,* 971 S.W.2d 536, 538 (Tex.App.-Dallas 1997, no pet.)). Undue prejudice occurs when permitting the withdrawal and allowing a late response will delay the trial or significantly hamper the opposing party's ability to prepare for trial. *Wheeler,* 157 S.W.3d at 443.

■ Salazar served his second and third requests for admissions in August and September of 2003 respectively. Appellees apparently did not become aware of their failure to respond until June 2004 when Salazar filed his amended motion for partial summary judgment and response to Appellees' summary-judgment motion. In Appellees' motion to strike the deemed admissions, they stated that their failure to answer the requests for admissions happened because these documents were inadvertently misplaced after they were received by the Office of the Attorney General and were never routed to the particular attorney assigned to the Salazar case.

Appellees' motion indicates that there was no conscious indifference on their part and that the failure to timely respond was due to a clerical error within the Office of the Attorney General. Thus, the court did not abuse its discretion by finding good

---

**5.** Salazar apparently abandoned his claims that Appellees are liable for housing him in the administrative segregation unit with Basden despite knowing that they were members of rival "disruptive groups."

cause for the withdrawal of the deemed admissions. *See Spiecker*, 971 S.W.2d at 541–42.

Regarding undue prejudice, there is nothing in the record to indicate that trial was delayed or Salazar's ability to prepare for trial was hindered by the trial court's decision. *See Wheeler*, 157 S.W.3d at 443. In fact, as will be seen hereinbelow, some of Appellees' late-filed responses actually support Salazar's contentions. We hold that the court did not abuse its discretion by permitting the withdrawal of the deemed admissions. Accordingly, we overrule Salazar's third issue.

### Contentions Which Will Not Be Addressed

Appellees address issues of vicarious liability and res judicata in their brief. For the reasons which follow, however, we find that these issues were not properly raised in the summary-judgment pleadings. Therefore, we shall not further address them on appeal.

■■■ A trial court cannot grant summary judgment on a ground not expressly presented in the summary judgment motion or a response thereto. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex.1996); *Watson v. Dallas Indep. Sch. Dist.*, 135 S.W.3d 208, 219 (Tex.App.-Waco 2004, no pet.). We may consider only those grounds "the movant actually presented to the trial court" in the motion. *Id.* Grounds raised in a brief filed in support of the motion or response, but not in the motion or response itself, may not be considered by the trial court or by this Court. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 340–41, 343 (Tex.1993); *Fletcher v. Edwards*, 26 S.W.3d 66, 74 (Tex.App.-Waco 2000, pet. denied).

Appellees stated in their summary-judgment motion that the motion presented two "Questions of Law":

A. Whether Defendants have a duty as described by Plaintiff (which forms the basis of his suit).

B. Whether Defendants are entitled to official immunity.

■■■ Collins made passing reference in the summary-judgment motion to his status as Executive Director of TDCJ and argued generally that he "has no duty for which he can be held liable" and that he "never had any personal interaction with Plaintiff or with Basden." However, he did not assert his administrative position with TDCJ as an independent ground for relief, he did not cite any legal authority to support the proposition that a TDCJ administrator cannot be liable for the negligence of prison employees, and he offered no summary-judgment evidence pertinent to these issues.

Garner similarly alleged that he was the prison warden during the relevant time period, that he "never had any personal involvement with Plaintiff or Basden," and that the "law doesn't intend for [him] to be liable for every incident that occurs at the prison." As with Collins, however, Garner did not rely on his administrative position as an independent ground for relief, he did not cite any legal authority to support the proposition that a prison warden cannot be liable for the negligence of prison employees, and he offered no summary-judgment evidence pertinent to these issues.

Appellees likewise refer to their administrative positions in their brief, but again they cite no legal authority to support the proposition that a TDCJ administrator cannot be liable for the negligence of prison employees.

Appellees do clarify these contentions somewhat in their appellate brief by claim-

ing that "Salazar is basically suing Garner and Collins under a theory of *respondeat superior*," but again they offer no argument or authority to support any contention that Salazar cannot recover under a theory of vicarious liability. Therefore, because Appellees did not present the issue of vicarious liability as an independent ground for relief in their summary-judgment motion, we may not consider it in this appeal. *See Cincinnati Life Ins.*, 927 S.W.2d at 625; *Fletcher*, 26 S.W.3d at 74.

■ Appellees also raised the affirmative defense of res judicata in a trial brief and refer to it again in their appellate brief. They claim that res judicata bars Salazar's suit because he was within the class of inmates involved in the *Ruiz* litigation. *See Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980), *aff'd in part and vacated in part*, 679 F.2d 1115 (5th Cir.1982). However, because Appellees did not address res judicata in their summary judgment motion, we may not consider it in this appeal. *See Cincinnati Life Ins.*, 927 S.W.2d at 625; *Fletcher*, 26 S.W.3d at 74.

### Special Relationship

Salazar contends in his first two issues respectively that the court erred by granting Appellees' summary-judgment motion and denying Salazar's motion for partial summary judgment because the evidence conclusively establishes that they had a legal duty to protect him from Basden.

Appellees contend in their summary-judgment motion that, as a matter of law, prison officials owe no duty to inmates to protect them from other inmates. They argue in particular that: (1) the mere fact that TDCJ houses violent inmates is not enough to establish the foreseeability necessary to impose a duty in this circumstance; (2) public policy dictates against the imposition of such a duty in the prison context; and (3) no "special relationship" exists between prison officials and prisoners warranting the imposition of such a duty.

Salazar contends in his amended motion for partial summary judgment/response to Appellees' motion that the requisite special relationship does exist.

We review a trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). In reviewing a summary judgment, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex.2007) (per curiam) (citing *Wal–Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex.2006) (per curiam); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex.2005)). We must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion. *See Goodyear Tire*, 236 S.W.3d at 756 (citing *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex.2006) (per curiam); *Spates*, 186 S.W.3d at 568).

■ "[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 598 n. 5 (Tex.2006) (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990)). Generally, there is no duty to control the conduct of third parties. *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex.2002) (citing *Greater Houston Transp.*, 801 S.W.2d at 525); *accord Loram Maint.*, 210 S.W.3d at 596. An exception to this general rule applies when a special relationship exists between an actor and another that imposes a duty on the actor to control the other's conduct. *Tex.*

*Home Mgmt.*, 89 S.W.3d at 34 (citing *Greater Houston Transp.*, 801 S.W.2d at 525).

The question of legal duty is a multifaceted issue requiring us to balance a number of factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case. Although the formulation and emphasis varies with the facts of each case, three categories of factors have emerged: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations.

*Id.* at 33–34 (citing *Greater Houston Transp.*, 801 S.W.2d at 525; *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)) (other citations omitted).

Thus, in *Texas Home Management*, the Court concluded after balancing these factors that a private facility for the mentally impaired which was required by State contract to exercise supervisory control of its residents could have a duty to exercise control over its residents.[6] *Id.* at 39. And in *Texas Department of Mental Health and Mental Retardation v. McClain*, 947 S.W.2d 694 (Tex.App.-Austin 1997, writ denied), the Austin Court held that the Austin State Hospital had a duty to exercise reasonable care to protect one patient from another. *Id.* at 697–98 (citing RESTATEMENT (SECOND) OF TORTS § 320 (1965)).

Finally, in *Browning v. Graves*, 152 S.W.2d 515 (Tex.Civ.App.-Fort Worth 1941, writ ref'd), the Fort Worth Court of Civil Appeals held that a sheriff (and his deputies) owes a duty "to use all reasonable efforts to protect his prisoner from harm while in his custody." *Id.* at 518. The court likewise held that such an officer may be found liable for injuries inflicted on one inmate by another if there is "knowledge on the part of such officer that such injury will be inflicted or good reason to anticipate danger thereof, and negligence in failing to prevent the injury." *Id.* at 519 (quoting Annotation, *Liability for Death of or Injury to Prisoner*, 46 A.L.R. 94, 114 (1927)); *accord Miller v. Jones*, 534 F.2d 1178, 1180 (5th Cir.1976).

*Browning* appears directly on point. Nevertheless, because there is no more contemporary Texas authority on this issue, we will examine the continuing viability of *Browning* in light of more recent decisions, such as *Texas Home Management*, in which the Supreme Court has established principles for determining whether a legal duty is owed in a particular setting.

We begin with *Greater Houston Transportation* and *Otis Engineering*, two of the foundational authorities on which the Court grounded its decision in *Texas Home Management*. Both of these decisions cited and followed the principles set forth in the Restatement (Second) of Torts for determining when a person owes a legal duty to control the conduct of another. *See Greater Houston Transp.*, 801 S.W.2d at 525 (citing RESTATEMENT (SECOND) OF TORTS §§ 315–20 (1965)); *Otis Eng'g*, 668 S.W.2d at 309 (same).

Section 315 of the Restatement provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

---

6. The Supreme Court did not hold that the facility in fact had such a duty but instead held that the facility's summary-judgment evidence failed to conclusively establish that it did not have such a duty. *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 39 (Tex.2002).

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

RESTATEMENT (SECOND) OF TORTS § 315.

Section 320 applies this principle in the context of a prison or jail (or other institution where a person is confined involuntarily).

Duty of Person Having Custody of Another to Control Conduct of Third Persons

One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control.

*Id.* § 320. Comment a then provides as follows:

The rule stated in this Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution, officials in charge of a state asylum or hospital for the criminally insane, or to teachers or other persons in charge of a public school. It is also applicable to persons conducting a private hospital or asylum, a private school, and to lessees of convict labor.

*Id.* cmt. a.

██ We first examine the relationship between the parties to ascertain the extent of control the defendant exercises over the third party. *See Tex. Home Mgmt.,* 89 S.W.3d at 34–36. In *Texas Home Management,* a mental health facility contracted with the Department of Mental Health and Mental Retardation to provide room and board, training, and treatment for juvenile offenders civilly committed due to mental retardation. *Id.* at 32, 35. This contract incorporated various state and federal regulations applicable to inpatient mental health facilities. *Tex. Home Mgmt.,* 89 S.W.3d at 36. Regarding the facility's right of control over the juvenile in question, the Supreme Court held, "these standards, which THM voluntarily contracted to follow, gave THM the right to control Dixon, and therefore a special relationship existed." *Id.* Here, it cannot be seriously questioned that TDCJ exercises an even greater right of control over prison inmates than the mental health facility in *Texas Home Management.* Thus, we hold as a matter of law that the requisite "special relationship" exists between inmates and TDCJ (and its employees).

Consistent with the Restatement and with *Browning,* a significant majority of courts in other states have likewise concluded that prison or jail officials owe a duty of reasonable care to protect inmates from harm when that harm is reasonably foreseeable.[7] *Cf. Tex. Home Mgmt.,* 89

---

7. *See B.R. v. State,* 144 P.3d 431, 435 (Alaska 2006); *Wertheim v. Pima County,* 211 Ariz. 422, 122 P.3d 1, 3–4 (Ariz.Ct.App.2005); *Dep't of Health & Rehabilitative Servs. v. Wha-* ley, 574 So.2d 100, 103–04 (Fla.1991); *Thomas v. Williams,* 105 Ga.App. 321, 124 S.E.2d 409, 412–13 (1962); *Haworth v. State,* 60 Haw. 557, 592 P.2d 820, 824–25 (1979); *Bar-*

S.W.3d at 36 n. 5 (citing supporting authorities from other states). Courts in several states have addressed this type of duty in other contexts in which a person is held involuntarily, has otherwise experienced an involuntary restraint of some degree, or has some other "special relation" as contemplated by section 315 of the Restatement.[8] Leaving aside for the moment the issue of sovereign or official immunity, our research has not disclosed a contrary decision.[9] *But see Chivas v. Koehler,* 182

---

8. *See Tarasoff v. Regents of the Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 343–44 (1976) (therapist who learned that patient intended to harm another owed duty to use reasonable care to protect intended victim); *Felger v. Larimer County Bd. of County Comm'rs,* 776 P.2d 1169, 1172 (Colo. Ct.App.1989) (special relationship between sheriff and probationer injured in community-service program); *Assoc. Health Sys., Inc. v. Jones,* 185 Ga.App. 798, 366 S.E.2d 147, 150–51 (1988) (nursing home owed duty to prevent one resident from assaulting another); *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755, 769–70 (1986) (probation officer has legal duty to exercise reasonable care to control conduct of probationer and prevent harm to third party); *State v. Johnson,* 108 Md.App. 54, 670 A.2d 1012, 1017–18 (1996) (special relationship between state and inmate established "duty to provide reasonable health care"); *Knight v. State,* 99 Mich.App. 226, 297 N.W.2d 889, 894 (1980) (social worker who knew person in her care posed danger had a duty "to exercise reasonable care to control the third person and prevent him from harming others"); *see also Rollins v. Petersen,* 813 P.2d 1156, 1159 (Utah 1991) (acknowledging "the general applicability in Utah of the 'special relation' analysis described in sections 314 through 320 of the Restatement").

nard v. State, 265 N.W.2d 620, 621 (Iowa 1978); *Jackson v. City of Kansas City,* 263 Kan. 143, 947 P.2d 31, 40–41 (1997); *Rowan County v. Sloas,* 201 S.W.3d 469, 479 (Ky. 2006); *Brou v. Orleans Parish Criminal Sheriff's Office,* 897 So.2d 817, 819–20 (La.Ct.App. 2005); *Cooney v. Hooks,* 535 N.W.2d 609, 611 (Minn.1995); *Daniels v. Andersen,* 195 Neb. 95, 237 N.W.2d 397, 400 (1975); *Butler v. Bayer,* 168 P.3d 1055, 1063–64 (Nev.2007); *Murdock v. City of Keene,* 137 N.H. 70, 623 A.2d 755, 756 (1993); *Harris v. State,* 61 N.J. 585, 297 A.2d 561, 563 (1972); *Doe v. City of Albuquerque,* 96 N.M. 433, 631 P.2d 728, 733 (N.M.Ct.App.1981); *Sanchez v. State,* 99 N.Y.2d 247, 754 N.Y.S.2d 621, 784 N.E.2d 675, 678 (2002); *King v. Durham County Mental Health Developmental Disabilities & Substance Abuse Auth.,* 113 N.C.App. 341, 439 S.E.2d 771, 774–75 (1994); *Clemets v. Heston,* 20 Ohio App.3d 132, 485 N.E.2d 287, 291–92 (1985); *Keeland v. Yamhill County,* 24 Or. App. 85, 545 P.2d 137, 139 (1976); *Saunders v. State,* 446 A.2d 748, 750 (R.I.1982); *Blakey v. Boos,* 83 S.D. 1, 153 N.W.2d 305, 307 (1967); *Jankee v. Clark County,* 235 Wis.2d 700, 612 N.W.2d 297, 321 (2000); *accord Cortes Quinones v. Jimenez Nettleship,* 773 F.2d 10, 15 (1st Cir.1985) (applying law of Puerto Rico); *Frett v. Virgin Islands,* 839 F.2d 968, 975–76 (3d Cir.1988) (applying law of Virgin Islands), *overruled in part on other grounds by Ngiraingas v. Sanchez,* 495 U.S. 182, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990); *Matthews v. Dist. of Columbia,* 387 A.2d 731, 734 (D.C.1978); *see also Marshall v. Winston,* 239 Va. 315, 389 S.E.2d 902, 904 (1990) (recognizing duty to prevent inmate released from jail from harming foreseeable victims but holding that plaintiff failed to allege or show that sheriff knew or should have known that inmate intended to attack plaintiff); *Rayfield v. S.C. Dep't of Corrections,* 297 S.C. 95, 374 S.E.2d 910, 918 (1988) ("not questioning" the concept of duty set out in Restatement sections 314 through 320 but holding that special relationship ended when inmate was released from custody).

9. The common law duty discussed in this paragraph is not to be confused with the constitutional duty imposed on prison officials by the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *See Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988)). Suits premised on this constitutional duty are usually brought under title 42, section 1983 of the United States Code. *See, e.g., Johnson v. Johnson,* 385 F.3d 503 (5th Cir. 2004); *Horton v. Cockrell,* 70 F.3d 397 (5th Cir.1995) (per curiam); *City of Waco v. Hester,* 805 S.W.2d 807, 815–17 (Tex.App.-Waco 1990, writ denied).

Mich.App. 467, 453 N.W.2d 264, 268 (1990) ("special relationship" between prison guard and inmate giving rise to duty exists only if it is shown that guard has particular relationship with inmate which is different than relationship guard has with general inmate population).

■ We next examine the reasonable foreseeability of harm to the person injured. *See Tex. Home Mgmt.*, 89 S.W.3d at 36–39; *see also* RESTATEMENT (SECOND) OF TORTS § 320(b). The only summary-judgment evidence offered by Appellees is the affidavit of a TDCJ "classification chief" from a different prison unit explaining the prison system's policies for inmate housing generally. This affidavit makes no reference to the specifics of Salazar's claims.

By contrast, Salazar offered summary-judgment evidence in the form of Appellees' responses to his requests for admissions. Appellees admitted that Basden had assaulted other inmates with weapons. They also admitted that they both "had a general knowledge that inmate-on-inmate assaults did occasionally occur with weapons" in administrative segregation at the Hughes unit. However, Appellees denied any prior knowledge of a rivalry between Salazar's "disruptive group," the Hermanos de Pistoleros Latinos, and Basden's, the Aryan Brotherhood of Texas. With regard to the housing assignments of rival prison gangs,[10] Appellees stated, "classification policy and practice is to place buffer cells between members of rival disruptive groups if they are to be housed in the same area. Inmates in administrative segregation are furthermore housed in single cells."

With regard to Appellees' summary-judgment motion, we view the evidence in the light most favorable to Salazar. *See*

*Goodyear Tire*, 236 S.W.3d at 756. Applying this standard to the evidence pertinent to the issue of foreseeability, Appellees failed to conclusively establish that Basden "did not present an unreasonable and foreseeable risk of harm to [Salazar]." *See Tex. Home Mgmt.*, 89 S.W.3d at 36–39.

With regard to Salazar's motion for partial summary judgment, we view the evidence in the light most favorable to Appellees. *See Goodyear Tire*, 236 S.W.3d at 756. Applying this standard to the evidence pertinent to the issue of foreseeability, Salazar failed to conclusively establish that Basden did "present an unreasonable and foreseeable risk of harm to [Salazar]." *See Tex. Home Mgmt.*, 89 S.W.3d at 36–39.

Finally, we examine public policy considerations. *Id.* at 39. Appellees vigorously contend in their summary-judgment motion that public policy considerations weigh heavily against the imposition of a legal duty in the prison-inmate context.

> Basden was housed in the most restrictive area that TDCJ has for its offenders. There was nothing more either Defendant could have done. There is no harsher place to put either Basden or Plaintiff. Both the Plaintiff and his alleged attacker were in the most restrictive part of the prison. They had no other option in placing offenders. Defendants placed Basden in the most restrictive place they could; to hold them liable for "not doing more" would be a miscarriage of justice and set a bad precedent for public policy.

As with their sparse summary-judgment evidence, however, Appellees focus almost exclusively on inmate housing assignments without devoting any serious attention to Salazar's alternate claims regarding prison employees' admitted failure to implement

---

10. Appellees also admitted that the term "disruptive group" is a synonym for a "gang."

TDCJ security procedures for the administrative segregation unit.

As already stated, Appellees admitted that TDCJ "classification policy and practice is to place buffer cells between members of rival disruptive groups if they are to be housed in the same area." However, there is nothing in the record to indicate that a buffer cell was placed between Salazar and Basden. In addition, Appellees admit that TDCJ policy AD–03.50[11] requires prison guards to *"thoroughly"* search dayrooms and recreational areas "prior to and after each use", to *"thoroughly"* strip-search inmates "before and after recreation or leaving the assigned cellblock," and to place inmates "in mechanical restraints (*e.g.*, handcuffs)" whenever "escorting inmates to and from their assigned cells in administrative segregation areas." Appellees also admit: (1) inmates in the administrative segregation area "were allowed under specific circumstances to walk to and from recreation and showers unescorted by correctional officers and without handcuffs"; and (2) inmates "were not always strip-searched prior to being allowed out of their cells for recreation and showers."[12] Appellees could neither admit nor deny that Basden was strip-searched on the date of the alleged assault.

From the evidence including TDCJ's own administrative policies for security in the administrative segregation areas of its prisons, Appellees failed to conclusively establish that public policy considerations weigh against imposition of a legal duty in this instance.

To summarize, TDCJ and its officials and employees who exercise supervisory authority in its prisons have a "special relationship" with TDCJ inmates and thus owe a duty of reasonable care to protect inmates from harm when that harm is reasonably foreseeable. Here, genuine issues of material fact remain on the question of whether Basden presented "an unreasonable and foreseeable risk of harm to [Salazar]." *See Tex. Home Mgmt.*, 89 S.W.3d at 39.

Therefore, the court erred by granting Appellees' summary-judgment motion on the issue of duty but correctly denied Salazar's motion for partial summary judgment insofar as it was premised on this issue. Accordingly, we overrule Salazar's second issue which challenges the court's denial of his motion for partial summary judgment.

### Official Immunity

Salazar also contends in his first issue that the court erred by granting Appellees' summary-judgment motion on the issue of official immunity because Appellees failed to conclusively establish that (1) Salazar seeks to hold them liable for a failure to perform discretionary duties or (2) they were acting in good faith.

 Official immunity is an affirmative defense. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). When a defendant is the movant and relies on an affirmative defense, the defendant must conclusively establish each element of that affirmative defense to prevail. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996); *Moon v. Lesikar*, 230 S.W.3d 800, 802–03 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *Johnson v. Baylor Univ.*, 188

11. Appellees admitted that the copy of Administrative Directive No. AD–03.50 relied on by Salazar "is a verbatim excerpt" of the version of AD–03.50 applicable on the date of the alleged assault.

12. Appellees could neither admit nor deny that the recreation area had been searched on the date of the alleged assault.

S.W.3d 296, 300 (Tex.App.-Waco 2006, pet. denied).

A public official or employee is entitled to official immunity when a plaintiff seeks to hold him liable for (1) acting within the scope of his authority (2) in performing discretionary duties (3) in good faith. *See Ballantyne,* 144 S.W.3d at 424; *Chambers,* 883 S.W.2d at 653. By contrast, a defendant is not entitled to official immunity for the failure to perform (or negligent performance) of ministerial duties. *See Harris County v. Gibbons,* 150 S.W.3d 877, 886–87 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Myers v. Doe,* 52 S.W.3d 391, 396 (Tex.App.-Fort Worth 2001, pet. denied).

> Ministerial acts are those for which "the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Comm'r of the Gen. Land Office v. Smith,* 5 Tex. 471, 479 (1849). If the public official must obey an order, without having any choice in complying, the act is ministerial. If an action involves personal deliberation, decision, and judgment, however, it is discretionary.

*Ballantyne,* 144 S.W.3d at 425 (citing *Chambers,* 883 S.W.2d at 654) (other citation omitted).

The distinction between discretionary and ministerial acts is often one of degree because any official act that is ministerial still requires the exercise of some discretion. *Myers,* 52 S.W.3d at 396; *Enriquez v. Khouri,* 13 S.W.3d 458, 462 (Tex.App.-El Paso 2000, no pet.). Thus, mandatory language in a statute or policy does not, standing alone, make an act ministerial. *Titus Reg'l Med. Ctr. v. Tretta,* 180 S.W.3d 271, 275 (Tex.App.-Texarkana 2005, no pet.); *Eakle v. Tex. Dep't of Human Servs.,* 815 S.W.2d 869, 876 (Tex. App.-Austin 1991, writ denied).

Here, Appellees' summary-judgment evidence focuses on TDCJ's general policies and procedures for inmate housing assignments. By contrast, Salazar's summary-judgment response addresses admitted violations of TDCJ policy AD–03.50 which he contends are failures to perform ministerial duties. The pertinent policies are as follows:

IX. *Segregation Security Measures:* Each warden shall immediately take all necessary steps to insure that the safety and security of inmates and staff in segregation is maximized.

. . . .

D. Prior to and after each use, the shower areas, dayrooms, inside recreational areas and outside recreation area are to be *thoroughly* searched. Recreation activities are to be confined to the hours from 0700–2200 (7 a.m.–10 p.m.). Inmates shall be recreated before showering.

E. Inmates in segregation shall be *thoroughly* strip-searched before and after recreation or leaving the assigned cellblock.

X. *Administrative Segregation Escort Procedures:* The following procedures are to be followed in escorting inmates to and from their assigned cells in administrative segregation areas:

A. In order to prevent injury to others or serious property damage, any Group A inmate in administrative segregation shall be escorted as follows:

1. Anytime such an inmate is transported from his assigned cell, the inmate is to be placed in mechanical restraints (*e.g.,* handcuffs).

2. The mechanical restraints are to be placed on the inmate before opening the door of the cell. The inmate is to be directed to place his arms behind and through the foodslot for handcuffing. There shall be one officer required to escort administrative segregation inmates within the segregation area. However, there must be at least two officers present when escorting an inmate outside of the segregation area.

. . . .

4. Before being returned to their assigned administrative segregation cells, inmates shall be placed in mechanical restraints.

Appellees admit several violations of these policies including the following: (1) inmates in the administrative segregation area "were allowed under specific circumstances to walk to and from recreation and showers unescorted by correctional officers and without handcuffs"; and (2) inmates "were not always strip-searched prior to being allowed out of their cells for recreation and showers." Appellees could neither admit nor deny that Basden was strip-searched on the date of the alleged assault.

We hold as a matter of law that the violated policies establish ministerial duties because they prescribe and define the duties "to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *See Ballantyne,* 144 S.W.3d at 425; *Chambers,* 883 S.W.2d at 654. By Appellees' own admissions, prison employees failed to comply with these ministerial duties. Thus, a genuine issue of material fact remains on the question of whether prison employees complied with these ministerial duties on the date of the alleged assault.

Because Appellees failed to conclusively establish that Salazar seeks to hold them liable for a failure to perform discretionary duties, the court erred by granting their summary-judgment motion insofar as the motion was premised on official immunity. Accordingly, we sustain Salazar's first issue.

**Conclusion**

Appellees failed to conclusively establish that Basden did not present "an unreasonable and foreseeable risk of harm" to Salazar. They likewise failed to conclusively establish that Salazar seeks to hold them liable for a failure to perform discretionary duties. Accordingly, they were not entitled to summary judgment on the issues of legal duty or official immunity. Thus, we reverse the judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

Chief Justice GRAY concurs in the result with a note as follows: "I cannot join the majority's broad sweeping statements that are unnecessary in the disposition of this appeal of a summary judgment, therefore I join only the result. I cannot join the judgment because it makes reference to the majority's opinion which I cannot join."